THE RIGGS NATIONAL BANK, ET AL. *v.* WELSH, ET AL.

[No. 273, September Term, 1968.]

*Decided June 11, 1969.*

208

*Motion for rehearing filed June 19, 1969; denied July 8, 1969.* (Per Curiam filed, see p. 217, *infra*).

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Warren K. Kaplan,* with whom were *Leonard S. Melrod* and *Ralph F. Berlow* on the brief for appellants, Larsson and Lopez & Santos Concrete Contractors, Inc.

Submitted on brief by *Cary M. Euwer* for appellant Riggs National Bank.

*Carlyle J. Lancaster,* with whom was *T. Hammond Welsh, Jr.,* on the brief for appellees Welsh and Lancaster, substituted trustees.

*Robert J. Elliott,* with whom were *George E. Monk, Hogan & Hartson, Cary M. Euwer, Robert Y. Clagett*

and *Taylor, Euwer & Clagett* on the brief for appellee Riggs National Bank.

Submitted on brief by *Joseph Sitnick* and *Joseph B. Calandriello* for appellee George Raab.

SMITH, J., delivered the opinion of the Court.

T. Hammond Welsh, Jr., and Carlyle J. Lancaster (Trustees) are the substituted trustees under a deed of trust from James C. Conley & Co., Inc. (Conley) to the Riggs National Bank (Riggs). Conley was building an apartment complex known as "Barnaby Run Apartments, Section 3". The deed of trust covered the land where the complex was being built. Default occurred. The trustees foreclosed. An audit was stated. Exceptions were filed to the audit by appellants Magnus Larsson (Larsson) and Lopez & Santos Concrete Contractors, Inc. (Lopez) each of whom claimed a mechanics' lien having priority over the deed of trust.

Larsson and Lopez attack the action of the chancellor in overruling their exceptions to the auditor's report. We shall sustain the chancellor's ruling on this subject.

Riggs filed a petition alleging that the amount of interest which had accrued from the date when the audit would have been ratified in ordinary course on February 5, 1968, to the date when the report was ratified on March 27, 1968, was $2715.57, and praying that it might be allowed this sum, the trustees having disbursed the amount audited to Riggs immediately after ratification of the audit. The chancellor denied the petition from which denial Riggs appealed. We shall reverse this action of the chancellor.

## MECHANICS' LIENS

At the time of the execution of the deed of trust to Riggs, Conley and Riggs entered into a building loan agreement. The deed of trust was dated December 5, 1966, and recorded December 6, 1966. There is no contention that work began prior to recordation of the deed of trust. Larsson claimed a lien for labor and materials between December 20, 1966, and April 19, 1967. Lopez

claimed a lien for labor and materials between December 12, 1966, and July 9, 1967.

The first advance made by Riggs under the building loan agreement was in the amount of $38,442.00 on December 29, 1966. Subsequent advances were made on January 26, February 15, March 13, April 3 and May 1, 1967. The total of these six advances was $266,679.16.

By the terms of the deed of trust Conley was obliged to pay interest from the date of the deed of trust "on the 1st day of January, 1967, and on the 1st day of each succeeding month up to and including January 1, 1968 * * *". It is conceded that no interest was paid, although the chancellor said in his opinion:

> "First of all, we think the point regarding interest—we are not sure that it would have been too important, but it was certainly emphasized by the exceptants—didn't seem to hold too much water. They hoped to get a sum of $2200, from some evidence, and then they put on Mr. Conley as their own witness and Mr. Conley says he had a check there for $371 for interest to Riggs. That was their own witness and it was contrary to their theory of the case."

Paragraph 15 of the building loan agreement provided in pertinent part:

> "In any of the following events, all obligations on the part of Lender to make the Loan or to make any further advances shall, if Lender so elects, cease and terminate, and the Loan shall become due and payable at the option of Lender or holder of the Note * * *.
>     * * *
> "g. If the makers of the Note and Mortgage shall fail to comply with any of the covenants therein contained.
>     * * *
> "m. If Borrowers fail to keep, observe or perform any of the provisions or agreements

contained in this Agreement or in the Note or Mortgage."

Prior to making each advance, Riggs obtained a title report showing no recorded liens on subject property other than that of Riggs. Advances were made on the certification of a mutually acceptable individual who made physical inspections of the job site and detailed reports in writing to Riggs of the progress of the work prior to each advance.

Paragraph six of the building loan agreement provided as follows:

"Borrowers covenant that they will receive all advances hereunder as a trust fund to be applied first for the purpose of paying for the cost of the Project before using any part of the total of the same for any other purpose, but nothing herein shall impose upon Lender any obligation to see to the proper application of such advances by Borrowers."

The undisputed facts of this case are that funds paid by Riggs to Conley were not paid by Conley on the cost of building the apartment complex. James C. Conley, President of Conley, was called as a witness by Larsson and Lopez at the hearing on the exceptions to the audit. He testified that officials of Riggs did not know that he was paying Section 2 bills out of the sums drawn on Section 3 until approximately forty-five days after the job had been shut down. Negotiations went on to get the job going again. Then, as he put it, "I sat with Mr. Griffin one day and cleaned my soul; I told him that I had spent the money out of Section 3 funds for Section 2."

This testimony was corroborated by officials of Riggs. Moreover, Mr. Conley unequivocally testified that Messrs. Larsson and Lopez insisted that payments he made with money obtained from Riggs on Section 3 be applied to his prior indebtedness to Larsson and Lopez on Section 2, thereby creating a part of the diversion of funds.

In the one instance in which Riggs received a complaint of non-payment from a supplier prior to the mak-

ing of the loan advance of May 1, 1967, an official of the bank conferred with that individual and Mr. Conley prior to the making of the advance. Mr. Conley advised Riggs that there were sufficient funds in the requisition to pay the supplier and the supplier was advised as to the date on which payment was made and that if he were not paid he was to call Riggs. The supplier had no recorded lien as of that time.

After the advance of May 1, 1967, Riggs determined that there had been a diversion of funds and made no further advances.

Larsson and Lopez rely on Code (1968 Repl. Vol.) Art. 63, § 23 and the decision of this Court in *Frank M. Ewing Co. v. Krafft Co.*, 222 Md. 21, 158 A. 2d 654 (1960). With reference to mechanics' liens § 23 of Art. 63 states:

> "Every such debt shall be a lien until after the expiration of six months after the work has been finished or the materials furnished, although no claim has been filed therefor, but no longer, unless a claim shall be filed at or before the expiration of that period."

In *Ewing, supra,* this Court held that a voluntary advance by a senior lienor with actual knowledge of intervening liens ranks behind those intervening liens.

Larsson and Lopez argue that their claims for work done and materials furnished are liens under § 23, that Riggs knew that they had furnished labor and materials, that as a consequence Riggs was on notice of their liens, that Riggs was not obliged to make any advances after January 1 because interest was not paid, and, therefore, on the strength of the holding in *Ewing,* the liens of Larsson and Lopez are superior to the lien of Riggs' deed of trust as to all advances made subsequent to January 1.

In short, the position of Larsson and Lopez seems to be that although they received a very substantial part of the funds which Riggs advanced under the deed of trust knowing full well that these funds were intended to be for the bills incurred on the project the deed of trust covered, which funds were applied to other bills at the ex-

press insistence of Larsson and Lopez, Larsson and Lopez should, in effect, be entitled to cause Riggs to advance the funds yet a second time to the detriment of Riggs and to the benefit of Larsson and Lopez.

In *Lamar, Trustee v. Nylen*, 240 Md. 740, 215 A. 2d 806 (1966) this Court discussed *Ewing, supra,* and added:

> "We know of no authority and have been referred to none for the proposition that a construction loan lienor, absent fraud or bad faith, may not make advances permitted by his loan instruments when there are no other liens outstanding without losing his lien to creditors of the builder *who may eventually become lienors,* yet this is what we are asked to hold. We see no basis for so holding even if we were judicially inclined to do so." Id. at 742. (emphasis added)

In the view we take of this case we are not obliged to determine the applicability of *Ewing, supra.* 28 Am. Jur. 2d *Estoppel and Waiver* § 59 states:

> "Estoppel is frequently based upon the acceptance and retention, by one having knowledge or notice of the facts, of benefits from a transaction, contract, instrument, regulation, or statute which he might have rejected or contested. This doctrine is obviously a branch of the rule against assuming inconsistent positions, and it has been said that such cases are referable, when no fraud either actual or constructive is involved, to the principles of election or ratification, rather than to those of equitable estoppel. The result produced, however, is clearly the same, and the distinction is not usually made. Such estoppel operates to prevent the party thus benefited from questioning the validity and effectiveness of the matter or transaction insofar as it imposes a liability or restriction upon him, or, in other words, it pre-

cludes one who accepts the benefits from repudiating the accompanying or resulting obligation. And the principle of estoppel by the acceptance of benefits may operate to prevent a party from profiting by his own wrong."

and in § 68 we find:

"Generally speaking, a party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action. This principle operates to preclude one who prevents a thing from being done from availing himself of the nonperformance which he has himself occasioned. Similarly, it operates to prevent a person from taking advantage of his own wrong. It has also been held to prevent one who has been wronged in a transaction from subsequently impeaching it after having recognized it as valid."

These general statements found support in Maryland as recently as 1968. In *Mascaro v. Snelling and Snelling,* 250 Md. 215, 243 A. 2d 1 (1968) Judge Singley said for this Court:

"* * * [A]s was said in *Holly Hill Citrus Growers' Assn. v. Holly Hill Fruit Products, Inc.,* 75 F. 2d 13, 17 (5th Cir. 1935) :

'There is a kind of evidential estoppel which, though it may not amount to a complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to tes-

timonially give a different color to what they formerly said and did.'

"We think that principle applies here. Drossner is estopped from challenging the validity of a licensing system which he used to his own advantage when he obtained the Towson and Glen Burnie franchises, and from attempting to impose upon Mascaro limitations with respect to access to communications media which he did not assert against Towson and Glen Burnie. To permit him to do so would be to sanction the weaving of the very web of broader exclusivity which he failed to achieve by contract." *Id.* at 235.

Riggs advanced funds for payment of builders' claims arising on the project covered by the deed of trust executed for its benefit. Larsson and Lopez received a part of those funds, but they insisted upon diversion of the funds from their intended purpose by crediting those funds on other obligations of Conley. The lien claims of Larsson and Lopez would not exist had no such diversion taken place. Accordingly, we hold Larsson and Lopez are foreclosed by their own acts from asserting that their lien claims, which would not have existed without the diversion, are entitled to priority over the lien of Riggs.

## CLAIM FOR INTEREST

The sole question here is whether Riggs should be allowed interest from the date when the auditor's report would have been ratified on February 5, 1968, to the date when it was ratified on March 27, 1968, where the delay was caused by exceptors to the audit whose exceptions were overruled.

In *Aurora Fed. Sav. & Loan Assoc.*, 223 Md. 135, 162 A. 2d 739 (1960) this Court had before it the question of the allowance of interest in a mortgage foreclosure in Anne Arundel County. That county was not one of the counties covered by the provisions of then Code (1957) Art. 66, § 8 by which, in the cases of sales of real es-

tate under the jurisdiction of certain circuit courts, where the sales proceeds are subject to the payment of a mortgage on such real estate, interest provided in the mortgage is held to be payable for a period of sixty days following the date of sale or until the audit of such sale be ratified, whichever shall first occur. Judge (later Chief Judge) Prescott there said for this Court:

> "Contracts for the payment of interest are construed by the same rules of construction as are applied to contracts generally. 30 Am. Jur., *Interest*, § 5. The agreement between the parties in this case is clear and unambiguous. It calls for the payment of interest by the mortgagor from the date of the mortgage 'until the whole of said principal sum and interest shall be paid.' It is universally recognized that a mortgagee in this jurisdiction is not actually paid his claim upon the date of the sale of the mortgaged premises. The sale must be reported to, and ratified by, the court; and the auditor must prepare his account, which must, likewise, be ratified before the proceeds of sale may be safely distributed. With this practice so generally known and almost invariably followed, it seems to us that it would place a strained and somewhat tortured construction upon the mortgagors' and mortgagee's agreement to hold that the interest was, implicitly, stopped upon the date of the foreclosure sale. In Maryland, since early days, the tendency of the Court has been to treat interest as just compensation due. (citing authorities) We think the agreement called for the payment by the mortgagors of interest on the principal amount of the mortgage claim, plus simple interest at the rate named in the mortgage until the auditor's report, if promptly made, could be ratified; and, as the subsequent delay has been caused by no fault of the mort-

gagee, it should be allowed interest at the rate named in the mortgage until the new auditor's account, promptly stated, can be ratified." *Id.* at 140-41.

In this case the deed of trust foreclosed provides that interest shall be paid at the rate of six and one-half percentum per annum "until paid in full".

On the strength of the opinion in *Aurora, supra*, interest should be allowed in this case to the date of ratification of the audit.

> *Order overruling exceptions of Larsson and Lopez to the auditor's account affirmed; costs of that appeal to be paid by the appellants.*
>
> *Order denying interest to the Riggs National Bank on its deed of trust to the date of ratification of audit on March 27, 1968, reversed; costs to be paid from the fund.*

PER CURIAM.

Larsson and Lopez have moved for reconsideration or reargument. They call our attention to certain figures said to appear in the transcript which they say show that if credit were given for all funds diverted by Larsson and Lopez the Larsson and Lopez liens would still remain unpaid.

Maryland Rule 828 provides in pertinent part:

"a. *Appellant to Print.*

The appellant shall cause to be printed \* \* \* extracts from the record which shall include the parts thereof provided for by section b of this Rule arranged in the order in which the same appear in the record.

"b. *Contents.*

1. What to Be Included.

> The printed extract shall contain such parts of the record as may reasonably be necessary for the determination of the questions presented by the appeal, and shall include:
>
> \* \* \*
>
> (b) So much of the evidence, pleadings or other parts of the record as is material to any question the determination of which depends upon the sufficiency of the evidence, pleadings or other matter contained in the record to sustain any action, ruling, order or judgment of the lower court."

The record extract filed by Larsson and Lopez contains six printed pages of testimony. Riggs in its appendix pursuant to Rule 828 e printed 13 additional pages of testimony and five pages of the record relative to argument and the court's decision. The matter to which Larsson and Lopez make reference in their motion for reargument does not appear in either the record extract or appendix. In other words, from the record extract and the appendix it is impossible to determine the precise amount of the diversion.

In *Platt v. Wilson,* 191 Md. 371, 62 A. 2d 191 (1948) Judge (later Chief Judge) Henderson said for this Court:

> "We have indicated in several recent cases that this court will not undertake to pass upon testimony contained in the transcript, but not printed in an appendix to the brief, as contemplated by rule 39 of this court, so as to be available to each member of the court." (citing cases) *Id.* at 373.

More recently in *State Roads Comm. v. Sharper,* 231 Md. 411, 190 A. 2d 647 (1963) Judge Marbury said for this Court:

> "Maryland Rule 828 b 1 specifies that the printed extract *shall* contain such parts of the record reasonably necessary for the determina-

tion of questions presented on appeal. It is noted that this section is a mandatory requirement." (emphasis in original) *Id.* at 413.

Assuming that the record reflects that which Larsson and Lopez say it reflects, our decision would not be different. See *Lamar, Trustee v. Nylen,* 240 Md. 740, 215 A. 2d 806 (1966) appearing in the original opinion. Relative to "quasi" or "inchoate" liens see *Universal v. Congressional,* 246 Md. 380, 228 A. 2d 463 (1967) and *U. S. v. Pioneer American Insurance Company,* 374 U. S. 84, 83 S. Ct. 1651, 10 L.Ed.2d 770 (1963). As to the Larsson and Lopez contention that Conley was in default for nonpayment of interest from December, 1966, to May, 1967, see *Rupp, Trustee v. Johnston Co.,* 226 Md. 181, 172 A. 2d 875 (1961). That case involved a contest between the holder of a construction deed of trust and the holder of a conditional sales contract. Judge (later Chief Judge) Henderson said for the Court:

> "The argument is that the deed of trust was in default, almost from the start, in the payment of interest. This was a trivial amount and under the deed of trust did not constitute an automatic default. The Bank and the trustees were clearly authorized to waive a provision that was for the benefit of the lender and not for the benefit of unsecured creditors." *Id.* at 189-90.

Also see *Blaustein v. Aiello,* 231 Md. 375, 378, 190 A. 2d 639 (1963) in which there was a specific holding where there had been a voluntary advance under a construction first deed of trust that constructive notice by the recording of a second deed of trust was not sufficient to bring the case within the scope of *Frank M. Ewing Co. v. Krafft Co.,* 222 Md. 21.

We reaffirm our position that Larsson and Lopez are foreclosed by their own acts from asserting that their lien claims are entitled to priority over the lien of Riggs.

*Motion denied.*